UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
AT GREENBELT

| | | |
|---|---|---|
| In re: | : | |
| Placido Salazar & Maria N. Salazar | : | Case No. 10-10165-TJC |
| Debtors | : | Chapter 13 |
| ———————————————— | | |
| Placido Salazar & Maria N. Salazar | : | |
| Plaintiffs | : | |
| vs. | : | Adv. Proc. No. 10-00101-TJC |
| First Residential Mortgage Services Corp.; | : | |
| Wells Fargo Bank, National Association, as | | |
| Trustee for Certificate holders of Bear Stearns | : | |
| Asset Backed Securities I LLC, Asset Backed | | |
| Certificates, Series 2007-AC2; and | : | |
| EMC Mortgage Corporation | : | |
| Defendants | : | |
| ———————————————— | | |

**THIRD AMENDED COMPLAINT**

**I. PRELIMINARY STATEMENT**

1.      This Complaint is filed under the Truth in Lending Act, 15 U.S.C. § 1601

(hereinafter called "TILA"), to enforce the Plaintiffs' right to rescind a consumer credit

transaction, to void the Defendants' security interest in the Plaintiffs' home, and to recover

statutory damages, reasonable attorney's fees and costs by reason of the Defendant's violations of

TILA and Regulation Z, 12 C.F.R. § 226 (hereinafter called "Regulation Z"). This action is also

filed for actual and statutory damages from Defendant EMC pursuant to 12 U.S.C. §§

2605(e)(1)(A) and 2605(e)(1)(B)(2) and §§ 3500.21(e)(1) and 3500.21(e)(3) of Regulation X. This action also is filed for damages against First Residential for its unfair and deceptive conduct in violation of the Maryland Consumer Protection Act ("MCPA"), section 13-101 *et seq.*, Maryland Commercial Law Article. This action also is filed against all defendants to recover damages resulting from defendants' fraud, misrepresentation, and civil conspiracy.

## II. JURISDICTION

2.    On January 5, 2010, Plaintiffs filed a voluntary petition under chapter 13 of the Bankruptcy Code (Title 11, United States Code). Therefore, the Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157, as amended, and the Order of Reference made by the district court for this district (which Order was entered in accordance with the Bankruptcy Amendments and Federal Judgeship Act of 1984). Jurisdiction is further conferred on the Court by 15 U.S.C. § 1640(e) and 28 U.S.C. §§ 1331, 1337. The Court has authority to issue a declaratory judgment by virtue of 28 U.S.C. § 2201. The Court has both personal and subject matter jurisdiction to hear this case pursuant to 28 U.S.C. Sections 1334 and 157(b)(2). The Court has jurisdiction to hear the claims for relief under the Real Estate Settlement Procedures Act pursuant to 12 U.S.C. § 2614. The Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. Section 1367.

3.    This matter is a core proceeding and therefore the Bankruptcy Court has jurisdiction to enter a final order. However, in the event this case is determined to be a non-core proceeding then and in that event the Plaintiffs consent to the entry of a final order by the Bankruptcy Judge.

### III. PARTIES

4.      The Plaintiffs are the Debtors, Placido Salazar ("Placido") and Maria N. Salazar ("Maria") (individually or collectively, "Plaintiffs"). The Plaintiffs own and reside at the real property known as 604 Eldrid Drive, Silver Spring, Maryland (the "Property).

5.       Defendant First Residential Mortgage Services Corporation (hereinafter "First Residential") is a New Jersey corporation engaged in the business of mortgage banking and loan correspondence with a principal place of business located at 570 Sylvan Ave., Englewood Cliffs, NJ 07632-3101. First Residential's Maryland Resident Agent is HSC Agent Services, Inc., 245 West Chase Street, Baltimore, MD 21201. First Residential is identified as the originating lender on Plaintiffs' Deed of Trust encumbering the Property that was recorded January 2, 2007, at Liber 83566, folio 646, among the Land Records of Montgomery County, Maryland (the "Deed of Trust").

6.      a. Defendant assignee Wells Fargo Bank, National Association, as Trustee for Certificate holders of Bear Stearns Asset Backed Securities I LLC, Asset Backed Certificates, Series 2007-AC2 (hereinafter "Wells Fargo" or the "Trust"), is identified in that certain Deed of Appointment of Substitute Trustee, recorded on the Property October 28, 2009, at Liber 38259, folio 326, among the Land Records of Montgomery County, Maryland, as the owner and holder of the Note secured by the Deed of Trust. Upon information and belief, Wells Fargo is not a holder of the Note.

b. On October 28, 2009, Wells Fargo initiated a foreclosure proceeding against Plaintiffs and the Property, allegedly pursuant to the Deed of Trust, in the Circuit Court of Maryland for Montgomery County, Case No. 322440V, and styled as *Jacob Geesing, et al. v.*

*Placido Salazar Claros, et ux.* (The "Foreclosure Case"). A foreclosure sale of the Property was scheduled in the Foreclosure Case for January 6, 2010.

7.      Defendant EMC Mortgage Corporation (hereinafter "EMC") is a Delaware corporation engaged in the business of mortgage lending, securitization, and servicing, with a principal place of business located at 2780 Lake Vista Drive, Lewisville, TX 75067-3884. EMC's Maryland Resident Agent is the Corporation Trust Incorporated, 351 West Camden Street, Baltimore, MD 21201. EMC is identified as the Seller, Master Servicer, and the Company in the Pooling and Servicing Agreement[1] (PSA) which governs the subject Trust, dated as of February 1, 2007 and filed with the Securities and Exchange Commission (SEC). Upon information and belief, the Note was not negotiated in accordance with the requirements set forth in the Pooling and Servicing Agreement and is not a negotiable instrument.

8.      a. At all times relevant hereto, First Residential, in the ordinary course of its business, regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments.

b. The roles played by Defendants Wells Fargo (Trustee and Custodian) and EMC (Sponsor and Master Servicer) in the securitization process for the subject loan is set forth in the Transaction Structure diagram found on page 15 of the Prospectus Supplement filed February 27, 2007 with the SEC.[2] EMC is 100% owned by The Bear Stearns Companies LLC, a Delaware

---

[1] A true and correct copy of the PSA can be found on the SEC's web site at:
http://www.sec.gov/Archives/edgar/data/1388968/000088237707000985/d642573_ex4-1.htm.

[2]  A true and correct copy of the Prospectus Supplement can be found on the SEC's web site at
http://www.sec.gov/Archives/edgar/data/1388968/000088237707000503/d637429_424b5.htm

LLC. The Bear Stearns Companies LLC is 100% owned by JPMorgan Chase & Co. The Bear Stearns & Company, Inc. was the underwriter.

## IV.  FACTS

9.      On or about November 20, 2006, Plaintiffs entered into a consumer credit transaction (hereinafter the "transaction") with First Residential in which the extended consumer credit was subject to a finance charge and which was initially payable to First Residential.

10.     Attached as PLAINTIFFS' EXHIBIT A is a true and accurate copy of the credit agreement evidencing the transaction (the "Note").

11.     As part of this consumer credit transaction, First Residential retained a security interest in the Property.

12.     The security interest was not created to finance the acquisition or initial construction of Plaintiffs' home.

13.     Attached as PLAINTIFFS' EXHIBIT B is a true and accurate copy of the mortgage evidencing First Residential's security interest (the "Deed of Trust").

14.     The settlement agent for the transaction was Excellente Settlements, Inc. ("Excellente"). Attached as PLAINTIFFS' EXHIBIT C is a true and accurate copy of the HUD-1 Settlement Statement ("HUD-1") prepared by Excellente and delivered to Plaintiffs on November 20, 2006 when the transaction closed. Excellente's representative stated at the outset of the closing that he was running late and pressed for time, and rushed Plaintiffs through the process of signing the settlement papers.

5

15.     Attached as PLAINTIFFS' EXHIBIT D is a true and accurate copy of Excellente's Deposit/Check Disbursement Statement for the transaction ("Disbursements").

16.     The HUD-1 inaccurately states that closing took place at Excellente's office at 401 N. Washington Street, Suite 950, Rockville MD 20850. Closing actually took place after 5:00 p.m. at the office of First Residential's loan officer, Victoria Zambrano ("VZ"), located at 8757 Georgia Avenue, Suite 1320, Silver Spring, Maryland (the "Closing").

17.     Plaintiffs were introduced to VZ by the real estate agent that helped them buy the Property in October 2005, and VZ recommended Excellente's closing services to Plaintiffs.

18.     Plaintiffs do not speak or read English. VZ served as Plaintiffs' interpreter throughout the transaction. Plaintiffs communicated with First Residential only through VZ.

19.     Placido emigrated to the United States from Bolivia and is a permanent resident alien of the United States. Placido works as a debris truck driver for E&J Services Inc. of Laurel, Maryland, a roofing contractor, since at least 2005. Maria works as a cook and housekeeper for St. Patrick Church in Rockville, Maryland, where she has been employed for the past four years. Plaintiffs are not well educated and are unsophisticated in business and financial matters.

20.     All of the transaction documents signed by Plaintiffs at closing are in English. The subject loan is in Placido's name only, but the Deed of Trust was signed by both Plaintiffs since the Property is owned by Plaintiffs as husband and wife, tenants by the entirety.

21.     The subject loan, which was originated to be securitized, is known as a "stated income, stated asset" ("SISA") loan, and was underwritten based on Placido's credit score, the loan to value ratio, and the belief that residential real estate in this country can only go up in value.

22.     VZ never asked Placido how much income he received. She only asked Placido

for his social security number and his authorization to check his credit report, and she told

Placido that was the only information she needed to qualify him for a loan.

23.     VZ prepared the Uniform Residential Loan Application ("Application") that

Placido signed at closing, a true and correct copy of which is attached as PLAINTIFFS'

EXHIBIT E.

24.      The Application lists Placido's gross monthly income as $9,500 from fence

construction self employment, and Maria's income as zero. VZ supplied the income information

on the Application, which she got by searching www.salary.com for the average income of a

person engaged in fence construction, rather than reporting Plaintiffs' actual income. VZ did not

tell Plaintiffs that she falsified their income and occupation on the Application. Placido Salazar

did not know when he signed the Application that it incorrectly stated his income and his

occupation. Plaintiffs did not discover this fraud until after they employed attorney Robert J.

Haeger on July 9, 2009.

25.     VZ was acting within the scope of her employment, and in the manner she had

been taught at First Residential, when she stated Plaintiffs' income on the Application.

26.     First Residential never asked Placido for his tax returns, pay stubs, or any other

evidence of his actual income.

27.     The transaction resulted in little or no benefit to Plaintiffs, but cost them $7,443 in

closing charges (in the form of equity skimming) that would not have been incurred had the

transaction not been consummated, and decreased their debt service by only $61 per month. The

interest  rate on the first trust that was refinanced was a five-year ARM at a starting rate of

7.375%, a minimum rate of 2.375% and a maximum rate of 12.375% based on 6-month LIBOR

index plus 2.25%, with the first change date on November 1, 2010. Had Plaintiffs not refinanced,

their interest expense likely would drop significantly in November since LIBOR is currently at

0.39%.

28.　　Wells Fargo claims that First Residential assigned the obligation in question to it.

### V.  FIRST CAUSE OF ACTION
### VIOLATION OF TRUTH IN LENDING ACT
### (as to Defendants First Residential and Wells Fargo)

29.　　Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set

forth herein.

30.　　First Residential is a creditor within the meaning of § 1602(f) of the Truth in

Lending Act (15 U.S.C. §§ 1601 *et seq*., hereinafter "TILA" or the "Act") and Regulation Z, 12

C. F.R. § 226.2(a)(17), and as such was required to provide notices of the right to rescind the

transaction and to deliver material disclosures including, but not limited to, the amount financed,

finance charge and annual percentage rate to Plaintiffs consistent with the Truth In Lending Act.

31.　　Plaintiffs are consumers within the meaning of § 1602(h) of the Act and

Regulation Z, § 226.2(a)(11).

32.　　This consumer credit transaction was subject to the PLAINTIFFS' right of

rescission as described by 15 U.S.C. § 1635 and Regulation Z § 226.23 (12 C. F.R. § 226.23).

33.　　In the course of this consumer credit transaction, First Residential violated 15

U.S.C. § 1635(a) and Regulation Z § 226.23(b) by failing to deliver to the Plaintiff two copies of

a notice of the right to rescind that clearly and conspicuously disclosed the date the rescission

8

period expired. Instead, the notice incorrectly states the transaction date as October 26, 2006, rather than the actual transaction date of November 20, 2006. This violation was apparent on the face of the disclosure documents assigned.

34.    Attached as PLAINTIFFS' EXHIBIT F is a true and accurate copy of the Notice of Right to Cancel the transaction delivered at Closing to Plaintiffs.

35.    The disclosure statement issued in conjunction with this consumer credit transaction, and attached as PLAINTIFFS' EXHIBIT G, violated the requirements of TILA and Regulation Z in the following and other respects:

a.    By failing to include in the finance charge certain charges imposed by First Residential and payable by Plaintiffs incident to the extension of credit as required by 15 U.S.C. § 1605 and Regulation Z, § 226.4, thus improperly under-disclosing the finance charge in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z, § 226.18(d). Such amounts include, but are not limited to the following charges that are not "bona fide and reasonable," and therefore not properly excluded finance charges:

| HUD-1 LINE | AMOUNT CHARGED | DESCRIPTION | BONA FIDE | NOT BONA FIDE |
|---|---|---|---|---|
| 303 | $    9,015.33 | Cash out | $    8,905.50 | $109.83 |
| 1102 | $      195.00 | Abstract | $      179.00 | $16.00 |
| 1108 | $    1,002.00 | Title Insurance | $      532.50 | $469.50 |
| 1201 | $        60.00 | Releases | $          0.00 | $60.00 |

i.    Actual Disbursements. Excellente's Disbursements (Pls' Ex. D) prove that the actual amount disbursed to Placido Salazar from the transaction loan proceeds was $8,905.50, or $109.83 less than stated on the HUD-1 (Pls' Ex. C), which difference consists of

an extra day of interest in the amount of $76.30 (Line 901) and $33.53 in hidden bogus charges. Attached as PLAINTIFFS' EXHIBIT H is a true and correct copy of Excellente's unsigned HUD-1 printed 11/22/2006 showing the $76.30 in additional interest charged Placido Salazar, and First Residential's unsigned revised notice of right to cancel containing the correct transaction date, neither of which was ever presented to Plaintiffs. This violation was apparent on the face of the disclosure documents assigned. Upon information and belief, the disclosure documents assigned also included a ledger that listed the actual amount disbursed to Plaintiffs at closing. Excellente's Disbursements also prove that the $60 charged for government release recording charges (Line 1201) is bogus, and that the actual amount paid for the title abstract (Line 1102) was $179 rather than the $195 stated on the HUD-1.  Plaintiffs were not aware of these bogus charges, nor would a reasonable person have been, until sometime after January 29, 2010, when Excelente produced its transaction file.

    ii. <u>Title Insurance</u>.  Nearly half ($469.50) of the title insurance charges (Line 1108) in this transaction are bogus. Plaintiffs were charged $1,002 for the most expensive lender's title insurance policy possible (the Eagle policy at the original rate), rather than $532.50 for the least expensive lender's title insurance policy possible (standard policy with re-issue rate), in violation of Maryland Insurance Administration's Best Price Rule, which states that

> An individual insurer or insurance group consisting of multiple insurers must always place a consumer in the most favorably priced (least expensive) insurer / tier for which the consumer qualifies.

Attached as PLAINTIFFS' EXHIBIT I is a true and accurate copy of Maryland Insurance Administration's Best Price Rule. Attached as PLAINTIFFS' EXHIBIT J is a true and accurate

copy of First American Title Insurance Company's Title Insurance Rates for the State of

Maryland applicable on November 20, 2006, the date of the subject transaction.

        (a).   <u>Standard vs. Enhanced Coverage Rate</u>.  First Residential's

closing instructions required only the less expensive ALTA Title policy, not an expanded or

enhanced policy such as the Eagle policy.  Attached as PLAINTIFFS' EXHIBIT K is a true and

accurate copy of First Residential's closing instructions for the transaction.

        (b).   <u>Original vs. Re-Issue Rate</u>.  Plaintiffs purchased an original

owners' title insurance policy, insuring their interest in the Property in the amount of $410,000,

when they bought the Property on October 17, 2005, thereby qualifying for First American's title

insurance re-issue rates in the subject transaction.  Attached as PLAINTIFFS' EXHIBIT L is

Plaintiffs' Land America Commonwealth's Owner's Residential Advantage Policy A79-Z005712

dated October 17, 2005. Excellente knew Plaintiffs were qualified for First American's lender's

title insurance re-issue rate since Plaintiffs were refinancing two conventional Fannie

Mae/Freddie Mac uniform purchase-money deeds of trust on the property dated October 17,

2005, each of which contains the notation at the top of the recorded deed of trust that title was

insured by Commonwealth Land Title Ins. Co.  Plaintiffs also obviously qualified for First

American's lender's title insurance re-issue rates since Plaintiffs' recorded deed to the property

states that title was insured by Commonwealth Land Title Ins. Co.  Attached as PLAINTIFFS'

EXHIBIT M is a true and accurate copy of the Plaintiffs' recorded deed, Excellente's land

records search results dated 11/06/2006, and the first page and Schedule A of Plaintiffs' two

prior recorded deeds of trust on the property that were refinanced in the subject transaction, all

produced by Excellente as part of its closing file for the transaction.  Plaintiffs were not aware,

11

nor would a reasonable person have been aware, of these bogus title insurance charges until

sometime after July 9, 2009, when they engaged the services of attorney Robert J. Haeger.

b.      By improperly including certain charges, in the amount financed, which

are finance charges, including but not limited to those itemized in Paragraph 35(a) herein, First

Residential improperly disclosed the amount financed in violation of 15 U.S.C. § 1638(a)(2) and

Regulation Z, § 226.18(b); and

c.      By calculating the annual percentage rate (APR) based upon improperly

calculated and disclosed finance charges and amount financed, 15 U.S.C. § 1606, Regulation Z, §

226.22, First Residential understated the disclosed annual percentage rate in violation of 15

U.S.C. § 1638(a)(4) and Regulation Z, § 226.18(c).

36.      The disclosures improperly made by First Residential, as itemized in paragraph

35, are material disclosures as defined in the Truth in Lending Act, 15 U.S.C. § 1602(u),

Regulation Z, § 226.23 n. 48.

37.      The finance charge and APR were under-disclosed by more than $35, the

tolerance levels set forth in 15 U.S.C. §§ 1605(f) and 1635(i).

38.      By reason of those material violations of 15 U.S.C. § 1638, Plaintiffs have a right

of rescission for three years from the date of consummation of the loan pursuant to 15 U.S.C. §

1635(f).

39.      On November 19, 2009, Plaintiffs rescinded the transaction by sending a notice of

rescission to Defendants, by fax where indicated, and by regular U.S. Mail, or certified U.S. Mail

as indicated, return receipt requested, postage prepaid, as follows:

**Certified - Return Receipt Requested**              William F. Aldinger III, President

Wells Fargo Bank, National Association, as
Trustee for Certificate holders of Bear
Stearns Asset Backed Securities I LLC,
Asset Backed Certificates, Series 2007-AC2
299 South Main Street
Salt Lake City, UT 84111-1901

Wells Fargo Bank, National Association
c/o EMC Mortgage Corporation, Agent
909 Hidden Ridge #200
Irving, TX 75038

Wells Fargo Bank, National Association
c/o EMC Mortgage Corporation
2780 Lake Vista Drive
Lewisville, TX 75067-3884

First Residential Mortgage Services Corp.
570 Sylvan Avenue
Englewood Cliffs. NJ 07632
by US Mail and **Fax: 201-758-2800**

William F. Aldinger III, President
Wells Fargo Bank, National Association, as
Trustee for Certificate holders of Bear
Stearns Asset Backed Securities I LLC,
Asset Backed Certificates, Series 2007-AC2
Attn: BK Department, 1 Home Campus
P.O. Box 10335
Des Moines, IA 50328

Wells Fargo Bank, National Association, as
Trustee for Certificate holders of Bear
Stearns Asset Backed Securities I LLC,
Asset Backed Certificates, Series 2007-AC2
c/o Jacob Geesing, Esquire
Bierman, Geesing & Ward, LLC
4520 East West Highway, Suite 200
Bethesda, MD 20814
by US Mail and **Fax: 301-961-6545**

40.    Attached as PLAINTIFFS' EXHIBIT N is a true and accurate copy of Plaintiffs'
notice of rescission with the Broadcast Report evidencing fax transmission of the notice on
November 19, 2009 ("Rescission Notice"). Attached as PLAINTIFFS' EXHIBIT O is a true and
accurate copy of U.S. Postal Service Certified Mail Receipt postmarked 11/19/2009 for Article
Number 7005 1820 0007 9088 0063. Attached as PLAINTIFFS' EXHIBIT P is a true and
accurate copy of U.S. Postal Service Domestic Return Receipt evidencing delivery to Wells
Fargo of Article Number 7005 1820 0007 9088 0063. Article Number 7005 1820 0007 9088
0063 was an envelope which contained  Plaintiffs' Rescission Notice.

41.    Defendants First Residential and Wells Fargo received copies of the Plaintiffs'
notice of rescission on or about November 19, 2006.

42.    More than 20 calendar days have passed since the Defendants received copies of the Plaintiffs' notice of rescission.

43.    The Defendants have failed to take any action necessary or appropriate to reflect the termination of any security interest created under the transaction, including the security interest described in Paragraph 8, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2). Defendant Wells Fargo refused to honor the rescission by its agent's (EMC Mortgage Corp.) December 29, 2009 letter to Plaintiffs' counsel, Robert J. Haeger, a true and correct copy of which is attached as PLAINTIFFS' EXHIBIT Q.

44.    The Defendants have failed to return to Plaintiffs any money or property given by the Plaintiffs to anyone, including the Defendants, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

45.    As a result of the aforesaid violations of the Act and Regulation Z, pursuant to 15 U.S.C. §§ 1635(a), 1640(a), and 1641(c), Defendants are liable to Plaintiffs for:

    a.    Rescission of this transaction.

    b.    Termination of any security interest in Plaintiffs' property created under the transaction.

    c.    Return of any money or property given by the Plaintiffs to anyone, including the Defendants, in connection with this transaction.

    d.    Statutory damages of $2,000 for the disclosure violations.

    e.    Statutory damages of $2,000 for Defendants' failure to respond properly to Plaintiffs' rescission notice.

    f.    Forfeiture of return of loan proceeds.

14

g.      Actual damages in an amount to be determined at trial.

h.      Reasonable attorney's fees.

i.      Reduce Wells Fargo's claim by way of recoupment to the extent Plaintiffs'

claims are otherwise barred by a limitations or other defense.

## VI.  SECOND CAUSE OF ACTION
## VIOLATION OF REAL ESTATE SETTLEMENT PROCEDURES ACT
### (as to Defendant EMC)

46.     The preceding allegations of this complaint are re-alleged and incorporated herein

by this reference.

47.     Defendant EMC is the servicer of a "federally related mortgage loan" as that term

is defined in 12 U.S.C. § 2602(1). On November 19, 2009, Plaintiffs, though their attorney, sent

Defendants Wells Fargo and EMC a ''qualified written request'' (QWR) as that term is defined

under RESPA, 12 U.S.C. § 2605(e)(1)(B), and asked Defendants Wells Fargo and EMC to

provide them with information necessary to calculate the rescission tender amount under TILA,

as follows:

> Please provide me with an itemization of the loan disbursements, the loan charges, the
> current principal balance, and all payments received from my client, so that we may
> determine the exact amount needed for tender.

PLAINTIFFS' EXHIBIT N.

48.     Defendant EMC sent Plaintiffs a response dated December 11, 2009

acknowledging receipt of Plaintiffs' QWR. Thereafter, EMC sent Plaintiffs a letter dated

December 29, 2009, rejecting Plaintiffs' rescission demand and failed to provide the information

requested in Plaintiffs' QWR. EMC has failed to provide the information requested in Plaintiffs'

QWR.

49.     Defendant EMC violated RESPA, 12 U.S.C. § 2605(e)(2)(C) by failing to provide

the Plaintiff with the information and documentation requested, or an explanation why the

information sought was unavailable, no later than 60 days after receipt of the Plaintiff's qualified

written request.

50.     The Defendant has failed to comply with Section 2605 of Title 12 of the United

States Code.

51.     Defendant EMC has engaged in a pattern or practice of non-compliance with the

requirements of the mortgage servicer provisions of RESPA as set forth in 12 U.S.C. § 2605.

52.     Pursuant to 12 U.S.C. § 2605(f) and § 3500.21(f) of Reg. X, the Plaintiffs may

recover of the Defendant EMC actual damages, costs and reasonable attorney fees for each

failure of the Defendant to comply with any part of 12 U.S.C. § 2605.

### VII.  THIRD CAUSE OF ACTION
### VIOLATION OF MARYLAND CONSUMER PROTECTION ACT
### (as to all Defendants)

53.     The preceding allegations of this complaint are re-alleged and incorporated herein

by this reference.

54A.    Plaintiffs adopt as their own the allegations contained in the following complaints.

A.     *New Jersey Carpenters Litigation*

16

FIRST CONSOLIDATED AMENDED SECURITIES CLASS ACTION COMPLAINT,[3] ¶¶ 10-

13, *New Jersey Carpenters Health Fund v. Bear Stearns Mortgage Funding Trust*, 1:08-cv-

08093-LTS, United States District Court Southern District of New York:

10. Soon after issuance, the value of the Certificates collapsed. Plaintiffs'

holdings have lost over 56% of their initial value. (¶¶ 21-22). Further, the

likelihood of these securities ever recovering their value is severely diminished by the fact

that approximately *42%* of the mortgage loans underlying the Certificates – the source of

Certificate investors' financial return – are in delinquency, default, foreclosure or

repossession. Moreover, approximately *93%* of the Certificates have now been

downgraded by Moody's to "junk bond" investments. (¶ 84).

11. Since Certificate Investors were dependent on the quality of the mortgage collateral

for receipt of a return on their investment, the descriptions of the loan origination

guidelines in the Offering Documents were highly material disclosures to Certificate

purchasers. The loan origination guidelines contained in Offering Documents generally

required an examination of borrower creditworthiness (¶¶ 209-261) and the performance

of standard appraisals of the mortgage properties (¶¶ 209-261). These portions of the

Offering Documents contained misstatements and omissions since, as emerged only well

after issuance of the Certificates, BSRM, Encore, EMC and the Originators systematically

disregarded the stated underwriting guidelines set forth in the Offering Documents. (¶¶

209-278). These misstatements and omissions were further reflected in the fact that the

---

[3]  A copy can be downloaded from the court at https://ecf.nysd.uscourts.gov/doc1/12706341165. A true
bookmarked copy can be downloaded from Plaintiffs' counsel at
http://web3.customwebexpress.com/haegerlaw/UserFiles/File/First%20Am%20Class%20Action%20Complaint.pdf

Ratings Agencies themselves, in downgrading the Certificates from the highest nvestment grade to junk bond investments, specifically attributed the downgrades to "aggressive underwriting" in the origination of the loans (¶ 84); the utter collapse of the AAA ratings originally assigned the Certificates – down multiple levels to junk bond status (¶ 84); and the uniform pattern of exponential increases in delinquency, default and foreclosure rates almost immediately after the Offerings (regardless of when the Offering occurred). (¶¶ 79-80, 85-86, 99, 106, 121, 130, 143,152, 157).

12. While compliance with those loan underwriting guidelines was highly material to Certificate investors, who were dependent on the creditworthiness of the borrowers for interest and principal payments, Bear Stearns had no such similar financial interest. Bear Stearns conducted inadequate due diligence with respect to whether the loans were originated in conformity with the underwriting guidelines stated in the Offering Documents. Bear Stearns' "due diligence" principally occurred not during the underwriting phase of the Offering, but while Bear Stearns was inspecting smaller bulk loans for possible purchase from thirdparty loan originators after successfully bidding on the loans at auction. (¶¶ 63-70). At that stage, there was a disincentive for Bear Stearns to reject, or "kickback," loans as non-compliant with stated guidelines since the Originator would  be less likely to select Bear Stearns as the winning bidder in future auctions. Bear Stearns generally used non-conforming loans as a rationale to negotiate a lower price for the loans, not to reject them. Bear Stearns' "due diligence" was limited, inadequate and defective. (¶¶ 58-78, 167-185). Bear Stearns was forced to review loans on an expedited basis and unable to commit to a full review of the loan pools. Moreover, Bear Stearns did

not have a mechanism in place to prevent previously "kicked-back" loans from being resubmitted as part of later pools by an Originator.

13. Bear Stearns contracted out the inspection of loans for compliance with the Originator's underwriting guidelines to outside firms – Clayton Holdings, Inc. ("Clayton") and The Bohan Group ("Bohan") – and then conducted limited oversight of these subcontractors' activities. As disclosed as part of an ongoing investigation of investment banking misconduct in underwriting MBS being conducted by the New York Attorney General (the "NYAG"), Clayton and Bohan routinely provided investment banks with detailed reports of loans non-compliant with underwriting guidelines, but the investment banks routinely overrode exclusion of those loans from purchase and securitization. (¶¶ 70-78, 144). Further, the President of The Bohan Group stated that, by the time the Offerings of the Certificates took place, investment banks were requiring a review of only 5% to 7% of the entire loan pools. (¶ 68).

B.    *ERISA Litigation*

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS,[4] ¶¶ 53-60, *IN RE BEAR STEARNS COMPANIES ERISA LITIGATION*, Master File No.: 08 MDL No. 1963 (RWS), United States District Court Southern District of New York:

51. The Company [The Bear Stearns Companies Inc.] originated loans through two wholly-owned subsidiaries, the Bear Stearns Residential Mortgage Corporation

---

[4] A copy can be downloaded from the court at https://ecf.nysd.uscourts.gov/doc1/12706161876; a true bookmarked copy can be downloaded from Plaintiffs' counsel at http://web3.customwebexpress.com/haegerlaw/UserFiles/File/CONSOLIDATED%20CLASS%20ACTION%20COMPLAINT.pdf

("BEARRES") and later through Encore Credit Corporation ("ECC"), which the Company purchased in early 2007.

53. Many of the mortgages originated by BEARRES and ECC were "stated income," "no ratio," and "no-doc" loans that required less (or no) documentation to corroborate the borrowers' and brokers' representations about the borrowers' income and assets.

54. Moreover, the Company actively encouraged its loan originator subsidiaries to offer loans even to borrowers with poor credit scores and troubled credit histories. According to Confidential Witness Number 1 ("CW 1"), an Area Sales Manager who began work for ECC in January of 2006 and continued working at BEARRES until February of 2008, CW 1's office was under great pressure to "dig deeper" and originate riskier loans that "cut corners" with respect to credit scores or loan to value ("LTV") ratios.

55. As a result of these lax standards, the Company approved the great majority of all loan applications it received. While the national rejection rate was 29% in 2006, BEARRES rejected only 13% of applications in the same period.

56. In 2006 alone, using these questionable lending practices, BEARRES and ECC originated 19,715 mortgages worth $4.37 billion. Because these were "captive" originations, the mortgages originated by BEARRES and ECC were sent directly into the securitization process atBear Stearns.

57. As a result of Bear Stearns' hunger for loans to securitize, it also purchased huge numbers of risky loans originated by other companies through its

EMC Mortgage Corporation ("EMC") subsidiary. From 1990 until 2007, EMC purchased over $200 billion in mortgages.

58. The loans the Company purchased by this means were often as suspect as the loans it originated. Confidential Witness Number 2 ("CW 2"), a Quality Control and Reporting Analyst at EMC from April 2006 through August 2007, reviewed and examined loan origination and loan portfolio statistics on subprime loans purchased by EMC, and also created reports for upper management at EMC. CW 2 confirmed that EMC would buy almost everything, including extremely risky loans where the borrower's income and ability to pay could not be verified.

59. According to Confidential Witness Number 3 ("CW 3"), a former Collateral Analyst with the Company who worked for Bear Stearns in the first half of 2007, the Company understood that the loans it was purchasing through EMC were unusually risky. CW 3 reported that during the latter part of 2006 and the beginning of 2007 EMC was "buying everything" without regard for the riskiness of the loan. CW 3 explained that because of the potential for profits from securitizing these loans Bear Stearns managers looked the other way and did not enforce basic underwriting standards.

60. Confidential Witness Number 4 ("CW 4"), an Underwriting Supervisor and Compliance Analyst for EMC from September 2004 until February 2007, reported that the Bear Stearns traders responsible for buying the loans were fully aware of the weakness of the underlying loans. According to CW 4, the traders ignored CW 4's due diligence findings that borrowers would be unable to pay.

C.    *Ambac Litigation*

First Amended Complaint, AMBAC ASSURANCE CORPORATION, et al. V. EMC MORTGAGE

CORPORATION, et ux., UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF

NEW YORK, Index No. 08 Civ. 9464 (RMB) (THK):

6. More specifically, Bear Stearns intentionally implemented certain "due diligence"

protocols and rejected others to allow it to securitize loans made to borrowers with no ability

to repay their loans. To start, Bear Stearns utilized due diligence firms to re-underwrite loans

for its securitizations that *it knew* were not screening out loans that were defective and likely

to default. As Bear, Stearns & Co. Senior Managing Director Jeffrey Verschleiser stated in no

uncertain terms to fellow Senior Managing Director Michael Nierenberg in March 2006,

"[we] are wasting way too much money on Bad Due Diligence.[5] Almost exactly one year

later nothing had changed, and in March 2007, Verschleiser reiterated with respect to the

*same* due diligence firm that "[w]e are just burning money hiring them.[6] Despite this

recognition, Bear Steams did not change firms or enhance the diligence protocols. Thus, as

one of its due diligence consultants frankly admitted, "[a]bout 75 percent of the time, loans

that should have been rejected were still put into the pool and sold.[7]

7. Moreover, even while criticizing its due diligence firms for failing to adequately

---

[5] Email from Defendant Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director) to
Defendant Michael Nierenberg (Bear, Stearns & Co. Senior Managing Director), among others, dated
March 23, 2006, EMC-AMB 001542438-439.

[6] Email from Defendant Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director) to
Defendant Michael Nierenberg (Bear, Stearns & Co. Senior Managing Director), among others, dated
March 15,2007, EMC-AMB 005446200.

[7] Chris Arnold, *Auditor: Supervisors Covered Up Risky Loans,* National Public Radio, dated May 27,
2008, htlp:llwww.npr.orgitemplates/storylstory.php?storylId=90840958.

detect defective loans, Bear Stearns routinely overrode their conclusions that loans should not be purchased for securitizations, and went ahead and purchased and securitized those loans (up to **65% *of the time in the third quarter of 2006*** according to one firm's report).[8] Bear Stearns ignored the proposals made by the head of its due diligence department in May 2005 to track the override decisions, and instead took the opposite tack, adopting an internal policy that directed its due diligence managers to delete the communications with its due diligence firms leading to its final loan purchase decisions, thereby eliminating the audit trail.[9] Further still, Bear Stearns elected *not* to implement "significant" changes to its due diligence protocols designed to detect and reject risky loans.[10] In March 2007, for example, the same head of due diligence made a proposal "to completely revamp how we do due diligence," which he conceded was the *same* general proposal he made in May 2005, *but that was never implemented.*[11] This was not happenstance. Bear Stearns disregarded loan quality to appease its trading desk's ever increasing demand for loans to securitize. In fact, Bear, Stearns & Co. Senior Managing Director Mary Haggerty issued a directive in early 2005 to

---

[8]  Internal Report produced by Clayton Holdings, Inc., CLAY-AMBAC 0001770-80 at 1777 (showing a 65% override rate for EMC and 56% override rate for Bear Stearns in the third quarter of 2006).

[9]  4/21/2010 Mongelluzzo Deposition Tr. at 167-76; *2/3/2010* Rule 30(b )(6) Haggerty Deposition Tr. at 318-19.

[10]  *6/4/2010* Silverstein Deposition Tr. at 178.

[11]  Email from John Mongelluzzo (Bear, Stearns & Co. Vice President of Due Diligence) to Defendant Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance) and Defendant Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), among others, dated March 6, 2007, EMC-AMB 001431086.

*reduce* the due diligence "in order to make us more competitive on bids with larger sub-prime sellers.[12]

8. In full recognition that its due diligence protocols did not screen out defective loans and were merely a facade maintained for marketing purposes, Bear Steams' trading desk needed to quickly transfer the toxic loans from its inventory and into securitizations before the loans defaulted. So as early as 2005, Bear Steams quietly revised its protocols to allow it to securitize loans before the expiration of the thirty- to ninety-day period following the acquisition of the loans by EMC, referred to as the "early payment default" or "EPD" period. Bear Steams previously held loans in inventory during the EPD period because, as Bear Steams' Managing Director Baron Silverstein recently acknowledged, loans that miss a payment shortly after the loan origination *(i. e.,* within the EPD period) raise "red flags" that the loans never should have been issued in the first instance.[13] The revised policy enhanced Bear Steams' earnings by increasing the volume of loans it sold into the securitizations - but materially increased the riskiness of loans sold to the securitizations. Nonetheless, as its executives uniformly conceded, Bear Steams never once disclosed the changes in its due diligence and securitization policies to investors or financial guarantors such as Ambac. [footnote omitted (*See* Section III.C.2, below)].

9. And it gets worse. Not satisfied with the increased fees from the securitizations, Bear Steams executed a scheme to double its recovery on the defective loans. Thus, when the defective loans it purchased and then sold into securitizations stopped performing during the

---

[12]   Email from John Mongelluzzo (Bear, Stearns & Co. Vice President of Due Diligence) conveying instructions from Defendant Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance) to reduce due diligence, dated February 11,2005, EMC-AMB 001718713-14.

[13]   *6/4/2010* Silverstein Deposition Tr. at 192.

EPD period, Bear Steams confidentially (i) made claims against the suppliers from which it purchased the loans *(i.e.,* the "originators" of those loans) for the amount due on the loans, (ii) settled the claims at deep discounts, (iii) pocketed the recoveries, and (iv) left the defective loans in the securitizations. Bear Steams did not tell the securitization participants that it made and settled claims against the suppliers. Nor did it review the loans for breaches of EMC's representations and warranties in response to the "red flags" raised by the EPDs. Bear Steams thus profited doubly on defective loans it sold into securitizations. Indeed, the increase in loan volume from the securitization of defective loans proved so substantial, and the recoveries secured on those defective loans proved so lucrative that, by the end of 2005, the Bear Steams' trading desk mandated that all loans were to be securitized before the EPD period expired.[14]

10. Bear Steams also concealed that its "quality control" and "repurchase" processes were *not* devoted to flushing out and removing breaching loans from the securitized pools, as Bear Steams had represented. Rather, the processes were dedicated to securing recoveries against the suppliers of its toxic loans. That is, the quality control and repurchase departments' resources were focused virtually exclusively on (i) identifying grounds for Bear Steams to make claims against the suppliers of the loans it securitized, and (ii)

---

[14]  Email from Chris Scott (Bear, Stearns & Co. Senior Managing Director, Trading) to, among others, Robert Durden (Bear, Stearns & Co. Deal Manager) and Keith Lind (Bear, Stearns & Co. Managing Director, Trading), dated January 3, 2006, EMC-AMB 001385832-833; *12/11/2009* Rule 30(b)(6) Durden Deposition Tr. at 272-73.

settling the claims at a discount without ever notifying the securitization participants of the defective loans it identified or the funds it received. In other words, the quality control department that Bear Steams touted to Ambac and investors did not provide them with the represented benefits.

11. The secret settlement of the claims on the securitized loans was a win-win for Bear Steams and its suppliers, but a loss for the securitizations. It was a win for the suppliers in that they settled in confidence all claims with respect to the defective loans at a fraction of the full amount that would have been due had the loans been repurchased from the securitization. Conversely, if they did not comply with Bear Steams' repurchase demands, Bear Steams cut off the financing it extended for the origination of additional defective loans.[15] The secret settlement was a win for Bear Steams, which (i) reinforced its relations with the suppliers that it depended on to provide the precious fodder for future securitizations by settling at the discounted amount, and (ii) pocketed the recovery from the suppliers. It was a loss to the securitization participants, which were not notified of the defective loans in the securitizations and did not receive the benefit from the repurchase of defective loans from the securitizations.

12. Ironically, Bear Steams' scheme worked so well- and resulted in the

---

[15]  Bear Steams extended financing to its suppliers that it knew - from its due diligence and quality control processes - were originating defective loans, but cut-off that financing if the supplier defaulted on its settlement agreement with Bear Steams. *See* Letter from Stephen Golden (EMC Residential Mortgage Corp. President) to SouthStar Funding LLC, dated April 9, 2007, EMC-AMCBl 57571-72; Email from Paul Friedman (Bear, Stearns & Co. Senior Managing Director, Fixed Income) to Defendant Jeffrey Mayer (Bear, Stearns & Co. Senior Managing Director and Co-Head of Fixed Income), dated April 18, 2007, EMC-AMB 012043282-283. By agreeing to finance and purchase loans from suppliers of defective loans, Bear Stearns effectively engaged in the origination of defective loans.

securitization of so many loans made to borrowers that could not repay - that its quality control and repurchase processes were soon overwhelmed.[16] By late 2005, Bear Steams' internal audit department caught wind of the "significant backlog for collecting from and submitting claims to sellers," which it then tracked from October 2005 through January 2007.[17] Yet Bear Steams did not disclose that its lauded repurchase protocols were overwhelmed and were not providing any benefit to the securitizations, and that it was not evaluating whether the defective loans it identified complied with EMC's representations and warranties to the securitization participants.

13. By mid-2006, Bear Steams' repurchase claims against the suppliers of the loans had risen to alarming levels, prompting warnings from its external auditors and counsel. In a report dated August 31, 2006, the audit firm Price WaterhouseCoopers advised Bear Steams that its failure to promptly evaluate whether the defaulting loans breached EMC's representations and warranties to the securitization participants was contrary to "common industry practices, the expectation of investors and ... the provisions in the [deal documents].[18] Shortly thereafter, Bear Steams' internal counsel advised Bear Steams' management that it was breaching its contractual obligations by failing to contribute to the securitizations the proceeds it recovered pertaining to the loans in the securitizations.[19] Bear Steams did not disclose to Ambac either of the findings.

14. Instead of making the requisite disclosures and undertaking the appropriate cures,

---

[16] *4/26/2010* Golden Deposition Tr. at 119; *see* Section III.C.4, below.

[17] Bear Stearns Internal Audit Report, dated February 28, 2006, EMC-AMB 001496305-11 at p. 2; *see* Section III.C.4, below.

[18] *See* "UPB Break Repurchase Project - August 31, 2006," EMC-AMB 006803201-77 at 233

[19] *See 2/3/2010* Rule 30(b)(6) Haggerty Deposition Tr. at 456-57; *4/26/2010* Golden Deposition Tr. at 39-40.

in 2006 Bear Steams implemented measures to obscure the magnitude of defective loans in its securitizations, and maintain its flow of loans from the suppliers of the defective loans. Thus, Bear Steams quickly moved to reduce the outstanding claims - to the detriment of the securitizations - by (i) settling the claims at a fraction of the dollar, (ii) waiving the claims entirely, or (iii) deferring (and potentially avoiding) the claims by extending the EPD period for securitized loans that defaulted during the initial EPD period, but then resumed payments [footnote omitted - 18 *See* Section IILC.6, below]. Demonstrating the impropriety of its measures, Bear Steams explicitly directed its employees not to extend the EPD period for loans in Bear Steams' inventory, *i.e.,* not to apply the same rule for loans in its own inventory that it secretly adopted for the securitized loans. According to its Senior Managing Director, Bear Steams adopted this dual standard because it knew loans that experienced an initial EPD were likely to default again and the "trading desk didn't want to own loans in inventory that had an EPD.[20] Bear Steams' undisclosed policy thus imposed a risk on the securitizations that its own trading desk would not accept.

15. As a result of these covert measures, Bear Steams was able to quickly address the backlog of claims, without disclosing or analyzing whether the loans on which it submitted claims breached EMC's representations and warranties to the securitizations. By January 2007, the Bear Steams internal audit department reported that in 2006 it had resolved "$1.7 billion of claims, an increase of over 227% from the previous year," and that "$2.5 billion in claims were filed, reflecting an increase of 78% from the prior year.[21] The "majority" of the claims pertained to loans with EPDs, *i. e.,* the loans that Bear Steams acquired without

[20] *4/26/2010* Golden Deposition Tr. at 152-53.

[21] Bear Stearns Internal Audit Department Escalation Memorandum, dated February 26, 2007, EMCAMB 010858610-613 at 611.

conducting the represented due diligence and conveyed to the securitizations before they defaulted.[22]

16. As Bear Steams made concessions to compete for an ever dwindling supply of loans, the magnitude of the defective loans aggregated for its securitizations was starkly evident to the "deal managers" responsible for disclosing the material information concerning the Transactions to potential participants. Thus, the Bear Steams Vice President who acted as the deal manager for the SACO 2006-8 Transaction referred to the deal in correspondence with the trading desk as a "shit breather" and a "SACK OF SHIT.[23] Needless to say, Bear Steams neglected to mention to Ambac or investors its internal assessments and derogatory characterizations, and did not terminate its securitization.

17. Bear Steams elected instead to continue to mischaracterize and securitize. Indeed, in early 2007, Bear Steams publicly purported to "tighten" standards (to adopt policies that should have been in place all along) to buy time while it attempted to clear out its inventory of defective loans. For example, Bear Steams downgraded certain suppliers of its loans to "suspended" or "terminated" status pursuant to its touted "seller monitoring" protocols, but then directed its quality control personnel *to stop conducting reviews of those originators' loans* so it could move the loans out of its inventory and into its securitizations.[24] And, if these loans were not securitized and left in inventory, the traders went on tirades, demanding "to know why we

---

[22] *4/26/2010* Golden Deposition Tr. at 120-21.

[23] Remarkably, when his counsel attempted to elicit testimony to explain away these egregious characterizations, the best the Vice President could say is that "shit breather" was a "term of endearment." *6/2/2010* Smith Deposition Tr. at 211-12.

[24] *5/20/2010* Serrano Deposition Tr. at 180-184 (testifying that, over his objections, the President of EMC Residential Corporation, and others, directed the quality control department to stop the review of the suspended and terminated sellers).

are taking losses on 2nd lien loans from 2005 when they could have been securitized?????[25] Indeed, simultaneous with its hard sell to Ambac regarding its purported efforts to improve underwriting standards of the loans in the BSSL T 2007-1 Transaction executed in April 2007, the Bear Steams analyst working on the deal more accurately described the deal in internal correspondence as a "going out of business sale.[26] Another called it a "DOG".[27] Both were accurate, yet undisclosed, internal perspectives. Indeed, one of the largest sources of loans in the BSSL T 2007-1 Transaction was SouthStar Funding LLC, an originator that Bear Steams suspended before the Transaction closed, but stopped its quality control review on those loans so it could move them into the deal.

18. Bear Steams' material misrepresentations and omissions, and false representations and warranties, induced investors to purchase and Ambac to insure securities issued in the Transactions from December 2005 to April 2007.

20. In addition to the recently-revealed internal policies and practices that precipitated the Transactions, what was not known until the discovery in this matter was Bear Steams' (and thereafter lP Morgan's) deliberate misconduct to conceal and avoid accountability for their fraudulent conduct and contractual commitments after the Transactions closed. To start, in late 2007, as the rating agencies began to adjust their ratings of Bear Stearns' mortgage-backed securities, Bear Stearns senior executives - including

---

[25] Email from Keith Lind (Bear, Stearns & Co. Managing Director, Trading) to Defendant Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), among others, dated May 8, 2007, EMC-AMB 002283474-476.

[26] Email from Charles Mehl (Bear, Stearns & Co. Analyst, Mortgage Finance) to Keith Lind (Bear, Stearns & Co. Managing Director, Trading), dated April 5,2007, EMC-AMB 002075468.

[27] Email from John Tokarczyk (Bear, Stearns & Co. Associate Director) to Jeffrey Maggard (Bear, Stearns & Co. Managing Director and Deal Manager on the BSSLT 2007-1 Transaction), dated April 30, 2007, EMC-AMB 001469603-604 ("LETS CLOSE THIS DOG").

Senior Managing Director Thomas Marano - attempted to prop up those ratings with threats to withhold "every fee" due to the rating agencies that downgraded the Bear Stearns securities.[28] Bear Stearns then implemented a policy to conceal the defective loans it identified and thwart the repurchase demands made by Ambac and other securitization participants upon discovery of breaches of EMC's representations and warranties.

21. Despite being advised by its outside auditors and counsel in mid-2006 to review the defective loans it identified for breaches of EMC's representations and warranties, it was not until late 2007, when it could no longer stifle the concern regarding its securities, that Bear Stearns adopted a policy to undertake such review. The belated implementation prompted its Quality Control Director to note that Bear Stearns was for the first time "fully honoring [its] obligations to pro-actively review defective loans for potential PSA [or, securitization] breach.[29] But Bear Stearns did *not* thereafter comply with its obligations to provide notice of the breaches it identified, despite direct inquiries and proffers made by Ambac and other securitization participants.

22. By late 2007, Ambac began observing initial signs of performance deterioration in the Transactions, and requested from Bear Stearns the loan files for 695 non-performing loans, balance of approximately $40.8 million across all the Transactions. Ambac provided

---

[28] Email from Defendant Thomas Marano (Bear, Stearns & Co. Senior Managing Director) to Defendant Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), among others, dated October 17, 2007, EMC-AMB 001424910-911.

[29] Email from Leslie Rodriguez (EMC Residential Corporation Managing Director) to Whitney Long (EMC Residential Mortgage, Vice President of Risk Management and Claims), dated September 14, 2007, EMC-AMB 006870106-110 at 108. *See also* Email from Fernando Serrano (EMC Mortgage Corporation, Quality Control Manager), dated September 12,2007 attaching EMC Securitization Breach Quality Control Review protocol, EMC-AMB 011688246-249 at 248 ("Effective in September 2007, all Quality Control Channels ... are providing to the Securitization Breach team a monthly reporting of all defective loans. This will ensure that going forward all defective loans are reviewed for a securitization breach concurrent with the QC review.").

EMC with its findings and asked EMC to comply with its contractual obligations to cure or repurchase the non-compliant loans. In disregard of its contractual obligations, EMC refused and continues to refuse to do so, even though Bear Stearns itself had identified widespread breaches *in the very same loan sample.*[30]

23.   Indeed, unbeknownst to Ambac until the discovery in this case, Bear Stearns engaged a consultant to preemptively review the same loan files Ambac requested in late 2007. After an iterative review process between Bear Steams and its consulting firm to whittle down the breach rate, they still concluded that **56%** *of the loans* were defective.[31] In breach of its clear contractual obligations, Bear Stearns did not advise Ambac of its conclusions or provide Ambac or any other securitization participant with "prompt notice" of the breaches identified as it was required to do. Bear Stearns instead adopted a strategy to reject as a matter of course Ambac and other insurers' repurchase demands, regardless of Bear Stearns' own findings.

24.   Knowing that its fraudulent and breaching conduct was resulting and would result in grave harm to Ambac, Bear Stearns then implemented a trading strategy to profit from Ambac's potential demise by "shorting" banks with large exposure to Ambac-insured securities. (The "shorts" were bets the banks' shares or holdings would decrease in value as Ambac incurred additional harm.) In late 2007, Bear Stearns Senior Managing Director Jeffrey Verschleiser boasted that "[a]t the end of October, while presenting to the risk committee on our business I told them that *a few financial guarantors were vulnerable* to potential write downs in the CDO and MBS market and *we should be short* a multiple of 10

---

[30] EMC "agreed" to repurchase just nine loans out of the sample reviewed, but has not done so.

[31] Loan Disposition Summary (AMB071 0) prepared by Clayton Services, Inc. for Bear Stearns, dated November 16,2007, CLAY-AMBAC 019669.

of the shorts I had put on ... In less than three weeks we made approximately $55 million on just these two trades." [32] Bolstered by this success, Bear Steams carried this trading strategy into 2008. On February 17, 2008, a Bear Steams trader told colleagues and Defendant Verschleiser, "I *am positive fgic is done and ambac is notfar behind."* [33] The next day, in the same email chain, the trader again wrote to Defendant Verschleiser to clarify which banks had large exposures to Ambac, asking *"who else has bigfgic or abk [Ambac] exposures besides soc gen?"* [34] As it was "shorting" the banks holding Ambac-insured securities, Bear Steams continued to conceal the defects it discovered and deny Ambac's requests repurchase demands relating to collateral that back the securities issued in the Transaction. This strategy was reinforced when, in early 2008, Bear Steams merged with and was renamed as JP Morgan.

27. The senior management of Bear Steams (now JP Morgan) allowed the foregoing misconduct to occur, and failed to implement the controls required to prevent such abuses, because they were making tens of millions of dollars churning out securitizations replete with loans that never should have been made, and that were only made because Bear Steams provided the means to convert those loans into securities for sale to investors. Because Bear Steams was a public company, and they were "playing with other people's money," the Bear Steams executives disregarded the long-term implications of their conduct to generate the short-term earnings that funded their extraordinary compensation packages. This textbook

---

[32] Email from Defendant Verschleiser, dated November 20,2007, EMC-AMB 009600760-63.

[33] Email from Adam Siegel (Bear Stearns & Co. Senior Managing Director, ABSIMBS Credit Trading), dated February 17, 2008, EMC-AMB 012117052-063.

[34] Email from Adam Siegel (Bear Stearns & Co. Senior Managing Director, *ABS/MBS* Credit Trading), to Defendant Verschleiser, among others, dated February 18, 2008, EMC-AMB 012117048-051.

example of unmitigated and realized "moral hazard" risk has wreaked unprecedented harm on (i) the borrowers that have defaulted in droves and lost their homes because they were put into loans they could not afford, (ii) the investors that purchased the securities issued in the Bear Steams transactions, (iii) Ambac as a financial guarantor of the payments due to the investors, (iv) Bear Steams' own shareholders, and (v) the national, and indeed global, economy.

28. Bear Steams' derogatory characterization of the loan pools it securitized is consistent with Ambac's on-going analyses of the loans in the Transactions. After conducting the initial review noted above, Ambac reviewed a random sample of 1482 loans, with an aggregate principal balance of approximately $88.2 million, selected across all four Transactions. The results of that review are remarkable. Of these 1,482 loans, 1,351, or over 91 %, breached one or more of the representations and warranties that EMC had made to Ambac. As of June 2010, Ambac's loan-level review consisted of 6,309 loans, of which it identified 5,724 loans across the Transactions that breached one or more of EMC's representations and warranties. Bear Steams (now JP Morgan) - acting with authority to perform EMC's obligations under the Transactions - has to date "agreed" to repurchase only 52 loans, or less than 1 %, of those breaching loans, but has in fact not repurchased a single one. [footnote omitted - 36 *See* Section VI.A, below.]

29. The most prevalent breaches identified by Ambac are also the most troubling and involve: (i) rampant misrepresentations about borrower income, employment, assets, and intentions to occupy the purchased properties, and (ii) the loan originators' abject failures to adhere to proper and prudent mortgage-lending practices, including their own underwriting

guidelines. The pervasiveness of these breaches has subsequently been confirmed by EMC's recent disclosures of its internal quality control and claims documentation and data, as well as the dramatic testimony of the borrowers of those loans [footnote omitted - 37 *See* Sections VI.B, & C, respectively, below].

54B.   EMC and Wells Fargo knew or should have known that First Residential was regularly falsifying the income stated on loans it sold to EMC. Defendants knew at the time of the subject transaction that there was a pervasive industry pattern and practice of such stated income fraud in the origination of subprime mortgage loans like Plaintiffs' loan.

54C.   Defendants knew or should have known that Plaintiffs would rely on First Residential's approval of Plaintiffs' loan application as proof they could afford the subject loan. EMC and Wells Fargo were instrumental in providing the funding that enabled First Residential to deceive Plaintiffs into believing they could afford the subject loan.

54D.   Defendants' conduct was unfair and deceptive and violated the Maryland Consumer Protection Act ("MCPA"), section 13-101 *et seq*., Maryland Commercial Law Article, by intentionally mis-stating Plaintiffs' income and occupation on their mortgage Application (PLAINTIFFS' EXHIBIT E).  As a proximate result of the Defendants' violations of the MCPA, Plaintiffs have suffered damages, including emotional distress and mental anguish, and incurred legal fees.

## VIII.  FOURTH CAUSE OF ACTION
### FRAUD
### (as to all Defendants)

55.   The preceding allegations of this complaint are re-alleged and incorporated herein by this reference.

56.     Defendants misrepresented material information regarding the mortgage transaction, including but not limited to inflating Placido's income to qualify him for a loan that he could not afford, and telling him that all they needed to qualify him for a loan was his credit score and social security number.

57.     Defendants knew that the representations were false, or acted with reckless disregard to the truth.

58.     Defendants made these material misrepresentations to Plaintiffs with the intent that Plaintiff rely upon them.

59.     Plaintiffs acted in reliance upon the material misrepresentations.

60.     As a direct and proximate result of the material misrepresentations, Plaintiffs suffered damages including but not limited to increased finance charges, excessive loan expenses and interest rates, loss of other credit opportunities, damage to their credit rating, and other costs.

## IX.  FIFTH CAUSE OF ACTION
## MISREPRESENTATION
### (as to all Defendants)

61.     The preceding allegations of this complaint are re-alleged and incorporated herein by this reference.

62.     Defendants made a representation of one or more material facts, including but not limited to inflating Placido's income to qualify him for a loan that he could not afford, and telling him that all they needed to qualify him for a loan was his credit score and social security number.

63.     The representations were false when they were made.

64.     Defendants knew the representations were false when they made it or made the

36

representations recklessly without knowing whether the representations were true.

65.    The Defendants made the representations with the intent that plaintiffs rely on them and so that Defendants would profit from the transaction.

66.    Plaintiffs did rely on the representations.

67.    Plaintiffs were damaged as a result of their reasonable reliance on the representations including but not limited to increased finance charges, excessive loan expenses and interest rates, loss of other credit opportunities, damage to their credit rating, and other costs.

## X.  SIXTH CAUSE OF ACTION
### CIVIL CONSPIRACY
### (as to all Defendants)

68.    The preceding allegations of this complaint are re-alleged and incorporated herein by this reference.

69.    Defendants acted in concert pursuant to a common design to and plan to induce plaintiffs to enter into this mortgage transaction which had little or no benefit to them, including but not limited to providing the funding for the scheme.

70.    Defendants illegally, maliciously and wrongfully conspired with one another with the intent to and with the purpose of inducing Plaintiffs to enter into this mortgage transaction which had little or no benefit to them.

71.    The civil conspiracy resulted in damaging the plaintiffs including but not limited to increased finance charges, excessive loan expenses and interest rates, loss of other credit opportunities, damage to their credit rating, and other costs.

## XI.  SEVENTH CAUSE OF ACTION
## AIDING AND ABETTING
### (as to all Defendants)

72.     The preceding allegations of this complaint are re-alleged and incorporated herein by this reference.

73.     First Residential intentionally mis-stated Plaintiffs' income and occupation on their mortgage Application without Plaintiffs' knowledge.

74.     Defendants EMC and Wells Fargo purchased loans in 2006 such as Plaintiffs' from First Residential with actual knowledge that First Residential was originating such loans knowing they contained stated-income fraud.

75.     EMC and Wells Fargo knew that First Residential would not have been able to originate Plaintiffs' loan and engage in state-income fraud without the funding they provided. EMC and Wells Fargo aided, abetted and encouraged First Residential's wrongful and tortious conduct and knowingly provided substantial assistance, aid, and encouragement in the commission of such conduct by buying loans it knew were originated with stated-income fraud.

76.     As a result of Defendants EMC and Wells Fargo's tortious aiding and abetting of First Residential's tortious conduct, Plaintiffs have suffered severe economic injury.

## XII EIGHTH CAUSE OF ACTION
## OBJECTION TO CLAIM
### (as to all Defendants)

77.     The preceding allegations of this complaint are re-alleged and incorporated herein by this reference.

78.     On or about March 25, 2010, Wells Fargo filed a proof of claim herein against Plaintiffs in the amount of $382,820.09. *See* Claim No. 13.

79.     In its proof Wells Fargo claimed to be secured for the entire amount of its claim by an interest in the Property.

80.     Wells Fargo's claim against the Plaintiffs is not secured as the Plaintiffs' exercise of their right of rescission rendered void any security interest Defendants might have had in the Property. In addition, the Note was never transferred to Wells Fargo in accordance with the PSA, was separated from the Deed of Trust, and no longer is secured.

81.     Wells Fargo's claim is excessive and can not be allowed for the following reasons:

        a.     After rescission, the Plaintiffs are liable at most for the principal amount of the rescinded loan exclusive of finance charges, insurance charges and all other charges, 12 C. F. R. § 226.23, 11 U.S.C. § 502(b)(1);

        b.     Plaintiffs also have recoupment rights that reduce Wells Fargo's claim to the extent Plaintiffs' claims in this complaint are otherwise barred by a limitations statute or other defense.

        c.     Wells Fargo's claim is subject to all the defenses and set offs Plaintiffs have against First Residential and EMC.

**WHEREFORE**, the Plaintiffs having set forth their claims for relief against the Defendants respectfully pray of the Court as follows:

A.     That the Plaintiffs have and recover against the Defendants, jointly and severally, a sum to be determined by the Court in the form of actual damages;

B.     That the Plaintiff have and recover against the Defendants, jointly and severally, a sum to be determined by the Court in the form of statutory damages;

C.     That the Plaintiff have and recover against the Defendants, jointly and severally, a sum to be determined by the Court in the form of punitive damages;

D.     That the Plaintiff have and recover against the Defendants, jointly and severally, all reasonable legal fees and expenses incurred by her attorney;

E.     That this Court order Defendants, jointly and severally, to pay additional actual damages in a sum to be determined by the Court for violation of the Maryland Consumer Protection Act;

F.     That the Plaintiffs have such other and further relief as the Court may deem just and proper;

G      That this Court order the Defendant EMC to pay to the Plaintiffs their attorney's fees and costs and additional actual damages a sum to be determined by the Court for each failure to comply with any part of Section 2605 of Title 12 of the United States Code pursuant to Section 2605(f) of Title 12 of the United States Code and Section 3500.21(f) of Reg. X;

H.     The security interest in the Property be declared void;

I.      Defendants' claim be classified as wholly unsecured;

J.      Defendants' claim be reduced by all finance charges, insurance charges and all

other charges as required by 12 C. F.R. § 226.23;

K.      Plaintiffs be awarded all actual and statutory damages under TILA, §§ 1635 and

1640, for Defendant First Residential's initial disclosure violations and for its, and

its assignee's failure to honor Plaintiffs' rescission;

L.      the Claim be reduced by all actual and statutory damages that are awarded to

Plaintiffs by way of recoupment or otherwise; and

M.      the Court order such additional relief as is necessary in the interest of justice.

Respectfully submitted,
*/s/ Robert J. Haeger, April 13, 2011*
Robert J. Haeger, Md. Fed. Bar No. 25434
Attorney for Plaintiffs
11403 Seneca Forest Circle
Germantown, MD 20876
(888) 463-3520
www.haegerlaw.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served electronically on all
parties by the CM/ECF system.

*/s/ Robert J. Haeger, April 13, 2011*
Robert J. Haeger